EFILED
1/17/2020 6:41 PM
Friday, 21 February, 2020 12:40:53 PM
Dennis Gardner
Clerk, U.S. District Court
Clerk of the Circuit Court
Vermilion County, Illinois

# IN THE CIRCUIT COURT OF VERMILION COUNTY, ILLINOIS
## LAW DIVISION

WATCHFIRE SIGNS, LLC,         )
                                   )
               Plaintiff,         )
                                   )
         v.                    )     **No. 2020 L ____** 6
                                   )
CREE, INC.,                   )
                                   )
              Defendant.    )

## COMPLAINT

Plaintiff, Watchfire Signs, LLC ("Watchfire"), for its complaint against Defendant, states as follows:

## THE PARTIES

1. Plaintiff Watchfire Signs, LLC is a limited liability company organized under the laws of the State of Delaware, with a principal place of business and manufacturing facility in Danville, Illinois.

2. Plaintiff Watchfire (f/k/a Time-O-Matic, Inc.), was founded in 1932 and has since become the market and innovation leader in the digital billboard and electronic sign industry in North America.

3. Watchfire is a premium manufacturer of outdoor and indoor digital signs with vibrant displays, such as scoreboards and other video displays often used for advertising. Watchfire is known for manufacturing the best light-emitting diode ("LED") signs with the industry's highest quality components.

*See* WATCHFIRE SIGNS, https://www.watchfiresigns.com.

4. Watchfire has obtained and maintained its superior position and reputation in the digital sign industry by investing heavily in the research and development, *inter alia*, of the LED

sign modules that are incorporated into its signs, and which give Watchfire a competitive advantage.

5.    Each sign is comprised of hundreds of modules, which in turn are comprised of thousands of LED bulbs.

6.    The Watchfire displays at issue are very large and used for outdoor advertising around the country.

7.    Defendant Cree, Inc. ("Cree") is a corporation organized under the laws of the State of North Carolina with a principal place of business in Durham, North Carolina.

8.    Cree is a major manufacturer and supplier of LED components used in the production of large-scale LED screens.

*See* CREE LED COMPONENTS, https://www.cree.com/led-components.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this case because there is an actual and justiciable controversy between Watchfire and Cree.

10.    Further, the Court has jurisdiction over Defendant because the making and performance of the contracts at issue are substantially connected with business transacted in Illinois, promises and contracts were made in substantial relation to the State and tortious acts complained of were committed in this State. 735 ILCS 5/2-209 (a)(1), (2) and (7).

11.    Defendant Cree also conducts substantial business generally within the State of Illinois and is subject to general jurisdiction in the State of Illinois.  *Id.*

12.    This Court is a proper venue for this case because it is in the county in which the transaction or some part thereof occurred out of which the cause of action arose and because defendant is a non-resident and therefore venue is proper in any county.  735 ILCS 5/2-101.

## COUNT I

## (BREACH OF WARRANTY - FLEX TERMS AND CONDITIONS)

13.     From April 2017 through March 2018, Watchfire purchased and used Cree C4SMA and C4SMC type LED bulbs in the modules created for Watchfire's high quality displays.

14.     Cree's improper and unworkmanlike manufacturing procedures resulted in significant failure rates for the C4SMA and C4SMC LEDs, which led to a May 31, 2018 "Goodwill Agreement" between Watchfire and Cree.  A true and correct copy of the Goodwill Agreement is attached as Exhibit A.

15.     Under the Goodwill Agreement, in exchange for mutual releases of claims concerning the Cree C4SMA and C4SMC LEDs, Cree extended a $1,100,000.00 credit to Watchfire to be applied to any outstanding balances between Cree and Watchfire, newest to oldest.  (Ex. A.)

16.     As a result of Cree's assurances that its C4SMB line of LEDs would not have the same problems as the Cree C4SMA and C4SMC LEDs, Watchfire transitioned to using Cree's C4SMB LEDs in its displays.

17.     Watchfire only agreed to continue purchasing LEDs from Cree due to Cree's misrepresentations that it had corrected its manufacturing processes, and that the prior defects would not be a factor with the C4SMB LEDs.

18.     Most of the modules incorporating the C4SMB LEDs were assembled and manufactured by Flextronics Manufacturing Mex S.A. ("Flex"), who then sold the completed modules to its customer, Watchfire.

19.     In order to manufacture the modules it sold to Watchfire, Flex purchased C4SMB LED bulbs from Cree.

20.     On October 16, 2017, the first shipment of Cree C4SMB LEDs was received by Flex.

21.     In mid-November 2017, Flex ramped up production for Watchfire using the C4SMB LEDs in order to compensate for discontinuation of the C4SMA LEDs, which had resulted from the excessive failure rates of the C4SMA LEDs.

22.     In January 2018, Watchfire discovered the first failures in the C4SMB parts used in the modules manufactured by Flex.

23.     Watchfire has repeatedly advised Cree of the unacceptable failure rate of the C4SMB parts, and Cree has not offered or provided any remedy or payment of any kind.

24.     Prior to this proceeding, Watchfire sought Cree's payment of Watchfire's costs and expenses resulting from Watchfire and Flex's use of Cree's defective C4SMB parts.

25.     Watchfire's claims remain pending, and Cree has not made any payment, has not offered any replacement, recall or repair remedy of any kind, and has failed to formally respond. Cree has been notified of the defects and problems in its C4SMB parts on a continuous basis and has not offered or extended any suitable remedy at any time.

26.     The only action taken by Cree to date is the investigation of the failures reported and observed in the C4SMB parts.

27.     Cree's own testing and investigation revealed that the root cause of the failures was Cree's improper and unworkmanlike manufacturing procedures in China.

28.     Cree has not offered any solution or remedy.

29.     As part of the purchasing process, Cree accepted Flex's standard terms and conditions, in which they made warranties to Flex and its customers, including Watchfire.

30.     For every purchase of C4SMB parts by Flex, Flex issued a Purchase Order to Cree containing the Flex Terms and Conditions, a true and correct copy of which is attached as Exhibit B.

31.     The Flex Terms are the operative contract between the parties concerning at least all C4SMB parts Flex purchased and installed into modules for Watchfire to use in its digital signs.  (Ex. B.)

32.     The Flex Terms expressly cover Flex's customers, such as Watchfire, as intended beneficiaries.  (Ex. B, ¶¶ 7, 9, 15, 16, 18.)

33.     The Flex Terms became enforceable between the parties when Cree accepted Flex's purchase orders for C4SMB LEDs in October 2017.  (Ex. B, ¶ 1.)

34.     The contract was entered into for good and valuable consideration such that it is a valid and enforceable contract.

35.     Under the Flex Terms, Cree specifically made the following warranties to Flex and Flex's customers:

> **7.  WARRANTIES**. Seller warrants to Flex **and its customers** that it shall perform all Services hereunder in a competent and professional manner in accordance with the terms of this Order, industry accepted standards and all applicable laws and that the Goods shall be free of liens, new and unused, perform in accordance with all applicable specifications, including Seller's published specifications, and be **free from defects in materials, workmanship and design for a period of two (2) years from Flex' receipt of such Goods**. Seller further warrants it has the capability, experience, registrations, licenses, permits, and governmental approvals required to sell the Goods and perform the Services. Seller will perform the Services in a timely, efficient, professional and workmanlike manner in accordance with the applicable Order and to Flex' satisfaction. Services include all incidental services and tasks necessary to perform the Order and provide acceptable Services. All Services shall be deemed "works made for hire". To the extent any of the Services are not deemed "works made for hire" by operation of law, Seller hereby irrevocably assigns, transfers and conveys to Flex without further

consideration all of its right, title and interest in such Services, including any related or accompanying documentation and any software or other goods necessary for the provisions of the Services, and all rights of patent, copyright, trade secret or other proprietary rights in such materials. Seller acknowledges that Flex shall have the right to obtain and hold in their own name the intellectual property rights in and to such Services and software. Without limiting Flex' right to pursue any applicable remedies, Goods not meeting this warranty may in particular be returned to Seller for credit or replacement at Seller's expense, and at Flex' option, and Services not meeting this warranty shall be re-performed or fees reimbursed, at Flex' option. **Excessive Failure: Should Goods shipped in any ninety (90)-day period to Flex or should all Goods cumulatively received by Flex experience a failure rate of the lesser of any defective-part-per-million specified in the Order or more than zero point three per cent (0.3% = 3000 DPPM's) from the same defect or more than zero point five percent (0.5% = 5000 DPPM's) from cumulative defects, Seller shall prepare a plan for diagnosing and addressing the problem and will be responsible for all costs incurred by Flex and its customers in rectifying such failures, including, without limitation, for engineering changes, testing and field-recovery costs, as well as for all damages.**

(Ex. B, ¶ 7) (emphasis added).

36.     The failure rates for the C4SMB parts drastically exceed the threshold for Excessive Failure under Section 7 of the Flex Terms.  *Id.*

37.     These warranties included the warranty that Cree would provide a product that was free from "Excessive Failure," which the terms define as "the lesser of any defective-part-per-million specified in the Order or more than zero point three per cent (0.3% = 3000 DPPM's) from the same defect or more than zero point five percent (0.5% = 5000 DPPM's) from cumulative defects…"  *Id.*

38.     Cree was bound by these terms to replace at their cost any goods which failed to meet that warranty.  *Id.*

39.     In fact, the C4SMB failure rates were far in excess of what the terms define as "excessive failure," which Cree's own investigation revealed.

40.     Cree is further liable under the Flex Terms for all costs incurred by Flex and its customers in rectifying such failures, including, without limitation, for engineering changes, testing and field-recovery costs, as well as for all damages.

41.     Cree has failed to perform under these warranties, and is therefore in breach of its contract with Flex and Flex's customers, including Watchfire.

42.     Thus, Watchfire demands that Cree pay the replacement costs that Watchfire will incur as a result of the C4SMB failures, punitive damages, and any other damages which the Court sees fit to assess.

43.     Watchfire has been damaged as a Flex customer as a result of the failure of the C4SMB bulbs used by Flex to comply with the warranty.

44.     In August 2018, Watchfire requested that Cree provide a test plan to qualify these parts, as well as additional test data to show that the manufacturing process had, in fact, been improved.

45.     In October 2018 and January 2019, Watchfire reiterated this request, asking Cree to fulfill their contractual obligation to "prepare a plan for diagnosing and addressing the problem" of the failing C4SMB LEDs.  (Ex. B, ¶ 7.)

46.     To date, Cree has not given any data or other means of verifying whether the last C4SMB LEDs Watchfire or Flex purchased were subject to the faulty manufacturing process, or whether the manufacturing process has actually been improved since April, 2018.

47.     Cree breached the Flex Warranty Terms by:

    a.     Failing to manufacture the C4SMB parts in a competent and professional manner in accordance with the specifications for the LEDs, and industry accepted standards;

    b.     Failing to deliver the C4SMB parts in accordance with all applicable specifications, including Seller's published specifications;

    c.       Failing to deliver the C4SMB parts free from defects in materials, workmanship and design for a period of two (2) years from Flex' receipt of such Goods;

    d.       Failing to deliver the C4SMB parts in a professional and workmanlike manner;

    e.       Failing to prepare a plan for diagnosing and addressing the problem created by the Excessive Failure of the C4SMB parts; and

    f.       Refusing to pay or agreeing to be responsible for all costs incurred by Watchfire in rectifying the Excessive Failures of the C4SMB parts, including, without limitation, for engineering changes, testing and field-recovery costs, as well as for all damages.

48.     As a result of the existing and anticipated failure rate of the C4SMB Parts, all of the modules incorporating the subject parts must be replaced at Cree's expense.

49.     Watchfire has already incurred $1,405,942.30 in replacement and projects a total replacement cost of $15,602,910.77.  Further detail is set forth below and is subject to modification based upon any future expenses:

**C4SMB**

| | |
|---|---|
| Total Flex Purchases (Cree POs) = | $ 2,488,320.00 |
| Total Watchfire Purchases (Cree POs)= | $ 624,960.00 |
| Flex Module Cost | $ 10,948,450.93 |
| Watchfire Module Cost | $ 2,833,007.44 |
| Shipping Cost | $ 826,052.40 |
| Labor Cost | $ 995,400.00 |
| Total Flex & Watchfire Module Replacement Exposure  = | $ 15,602,910.77 |
| Flex Module Cost | $ 1,259,038.67 |
| Watchfire Module Cost | $ 20,679.59 |
| Shipping Cost | $ 70,424.04 |
| Labor Cost | $ 55,800.00 |
| Total Replacement Cost Incurred To Date = | $ 1,405,942.30 |

**WHEREFORE**, Watchfire Signs, LLC prays for a judgment: (1) finding that Cree has breached the Flex Terms; and (2) ordering that Watchfire, as a Flex customer, has been damaged

in an amount of at least $15,602,910.77, as well as any additional damages which the Court deems appropriate to assess against Cree.

## COUNT II
## (BREACH OF WARRANTY - CREE TERMS AND CONDITIONS)

50.     Watchfire repeats and realleges the allegations of paragraphs 1 through 49 as if fully set forth herein.

51.     Although the Flex terms and conditions are controlling in this dispute, Cree offered its own terms and conditions (the "Cree terms") in which they also made warranties to Watchfire.  A true and correct copy of the Cree terms are attached as Exhibit C.

52.     To the extent the court finds that the Cree terms apply to sales of C4SMB parts by Cree directly to Watchfire (all rights and defenses reserved), these terms create a valid and enforceable contract between the parties.

53.     Watchfire performed all of its obligations to Cree.

54.     Cree breached the warranties and violated Section 9 of the Cree Terms by failing to perform its work in a reasonable and workmanlike manner and to comply with the specifications for the Subject Parts.  (Ex. C, ¶ 9.)

55.     Cree has not taken any action to repair or replace the damaged parts it manufactured, and any limitation of remedy for the repair or replacement of parts under the Cree terms therefore causes those terms to fail of their essential purpose, particularly in light of Cree's malfeasance and intentional misconduct.

56.     Cree should be estopped from asserting any limited remedy under the Cree terms as a result of Cree's waiver, malfeasance, misrepresentations and fraud in the inducement to utilize the C4SMB parts.

57.     Watchfire has been damaged in an amount of at least $15,602,910.77, as well as any additional damages which the court sees fit to assess against Cree.

**WHEREFORE**, Watchfire Signs, LLC prays for a judgment: (1) finding that Cree has breached the Cree Terms; and (2) ordering that Watchfire has been damaged in an amount of at least $15,602,910.77, as well as any additional damages which the Court deems appropriate to assess against Cree.

## COUNT III
## (FRAUDULENT INDUCEMENT)

58.     Watchfire repeats and realleges the allegations of paragraphs 1 through 57 as if fully set forth herein.

59.     Cree knew that it would be unable to perform under the applicable warranties at the time it sold the defective C4SMB LEDs and misrepresented that Cree would fix its manufacturing processes, in order to induce Watchfire into buying the defective parts.

60.     As a result of Cree's fraudulent inducement and breach of contract, Watchfire has already incurred more than $1.4M in replacement costs, and expects future replacement costs to exceed $15.6M.

61.     To preserve their ongoing business relationship, Cree representatives represented to Watchfire and Flex that the Cree C4SMB would be a suitable replacement for the C4SMA and C4SMC and would be free from the manufacturing defects which had plagued the C4SMA and C4SMC LEDs.

62.     There are numerous documents created by Cree which identify the Root Cause of the failure of the C4SMB parts as the "contamination" of the bond pads of the LED chip with die attach material and the resultant "failure to make good connections with wire bond ball." Cree's own reports go on to state, "The process control monitoring was inadequate to detect a process

excursion affecting ball bond shear strength. Process variation lead to an insufficient gold ball bond process. The process control monitoring was inadequate to detect a marginality affecting ball bond shear strength."

63.     Watchfire was induced to switch to the C4SMB parts only as a result of Cree's repeated assertions that corrective measures had been taken with respect to the Subject Parts.

64.     Cree's own investigation revealed that Cree had not taken the corrective measures in its manufacturing process in China to solve the manufacturing problems plaguing the Cree LEDs.

65.     Cree's misrepresentations continued as late as April 2018 after defects in the C4SMB parts were manifest.  In order to induce Watchfire to continue to use the Cree parts, employees, such as Dave Emerson, were making statements to Watchfire that mid-December 2017 would be a "clean point" for the C4SMB parts.

66.     On April 11, 2018, during another visit to Watchfire, Dave Emerson, a Cree representative, specifically indicated that the remedial measures needed to prevent wire bond issues that led to a vast number of C4SMB failures had been implemented in December 2017 and no C4SMB LEDs manufactured after that point would have these defects.

67.     On April 23, 2018, however, representatives from Watchfire audited Cree's manufacturing facilities in Huzhou, China.  During this audit, they observed that the remedial actions Cree's representatives had assured Watchfire had been implemented were, in fact, only implemented for other product lines, and not for the C4SMB LEDs.

68.     Cree failed to make the improvements in its process control monitoring as repeatedly represented to Watchfire, which would have helped prevent the excessive failure rates of the C4SMB LEDs.

69.     Cree also failed to convert ovens used in the manufacturing process, as they had promised they would in February 2018, and which also would have helped prevent the excessive failure rates of the C4SMB LEDs.

70.     In short, Cree completely failed to implement the remedies it had promised, knowing that Watchfire would only continue to use C4SMB LEDs if it made such promises.

71.     At the same time that it was making these false representations, Cree implemented these changes for other lines of LEDs, demonstrating that it had the capacity but not the intention to remedy the C4SMB problem.

72.     Cree further admitted in its own documents and discussions with Watchfire that Cree's manufacturing personnel in China had falsified quality assurance testing records concerning the C4SMB parts.

73.     Watchfire and Flex reasonably relied on Cree's false representations before agreeing to purchase and to continue to use the C4SMB LEDS.

74.     But for Cree's fraudulent inducement, Watchfire and Flex would not have entered into agreements to purchase the C4SMB LEDs.

75.     Watchfire has incurred and will continue to incur damages as a result of Cree's breach.

**WHEREFORE**, Watchfire Signs, LLC prays for a judgment: (1) finding that Cree fraudulently induced Watchfire to continue purchasing C4SMB LEDs from Cree; (2) ordering that Watchfire has been damaged in an amount of at least $15,602,910.77; and (3) ordering that Cree pay punitive damages in an amount to be determined at trial, as well as any additional damages which the Court deems appropriate to assess against Cree.

**JURY TRIAL DEMANDED AS TO ALL ISSUES SO TRIABLE**

DATED:  January 17, 2020          Respectfully submitted,

_____

William M. Gantz

William M. Gantz (ARDC 6204397)
Michael Sciaccotta (ARDC 6324625)
David Hall (ARDC 6333638)
DENTONS US LLP
233 S. Wacker Drive
Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
bill.gantz@dentons.com
michael.sciaccotta@dentons.com
david.a.hall@dentons.com
*Attorneys for Plaintiff Watchfire Signs LLC*

# EXHIBIT A



## CONFIDENTIAL

May 31, 2018

Watchfire Signs, LLC
Attention: Steve Harriott
1015 Maple Street
Danville, Illinois 61832

### Re: *Goodwill Agreement*

Dear Mr. Harriott:

Cree, Inc. ("Cree") understands that Watchfire Signs, LLC ("Watchfire"), its Affiliates (as defined below), and their contract manufacturers, if any (collectively, the "Watchfire Entities") incurred significant costs and expenses relating to the performance of certain light-emitting diode ("LED") lighting displays incorporating the Subject Parts (the "Failed Displays"). Cree understands that these Failed Displays were produced by or for Watchfire and/or its Affiliates and incorporated one or more Cree LEDs with an order code beginning with C4SMA or C4SMC that were purchased on or before March 30, 2018 by the Watchfire Entities from Cree and/or its Affiliates (the "Subject Parts").

As used in this letter (the "Agreement"), the term "Affiliate" means, with respect to a party, any other entity controlling, controlled by, or under common control with such party, where "control" means the ownership of securities representing more than fifty percent (50%) of the voting capital stock or other interests having voting rights with respect to the election of the board of directors or similar governing authority, or any other power by contract or in any other form that entitles such party or entity to the respective voting rights.

Cree, on behalf of itself and its current and future Affiliates (collectively, the "Cree Entities"), and Watchfire, on behalf of the Watchfire Entities, have been in discussions concerning the liability or other responsibility, if any, of the Cree Entities related to the failure of Failed Displays. The Cree Entities disclaim any liability or other responsibility related to the failure of the Failed Displays; however, as a goodwill gesture in light of our longstanding relationship, Cree proposes the following resolution subject to your agreement to the terms and conditions set forth in this Agreement, as evidenced by your signature below:

1.      In order to compensate Watchfire for costs and expenses that the Watchfire Entities incurred in connection with the Failed Displays that incorporated the Subject Parts, within ten (10) business days after the latest date of signature below, Cree will issue, or cause one or more other Cree Entities to issue, to one or more of the Watchfire Entities one or more credit memos in an aggregate amount equal to $1,100,000.00 and apply these credit memos to any outstanding balances owed by a Watchfire Entity to a Cree Entity, with amounts owed offset from oldest to newest. Watchfire agrees to pay, and to cause the Watchfire Entities to pay, any amounts not offset

SPD-A773-4

by these credit memos according to the payment terms and conditions agreed upon by the applicable Watchfire Entity and the applicable Cree Entity.

2.    In return for the concessions offered above, each party, on behalf of itself and its Affiliates, acknowledges and agrees that the subject matter of this Agreement, its existence, and the terms and conditions herein are confidential information, and each party agrees not to disclose the subject matter of this Agreement, its existence, or the terms and conditions herein to any third party without the prior written approval of the other party. Notwithstanding the foregoing, either party may disclose the terms of this Agreement to the extent required in connection with any enforcement action concerning this Agreement to its Affiliates and to its internal or external legal, accounting, financial, or other professional advisors in the ordinary course of its business, provided that in each case such recipients are bound by professional or written obligations to maintain such information in confidence. Further, Watchfire agrees, and will cause the Watchfire Entities, not to disparage any Cree Entity or the Subject Parts.

3.    In exchange for entering into this Agreement and the consideration referred to above:

Watchfire agrees (for itself, all Watchfire Entities, and their respective successors and assigns) to release and forever discharge all Cree Entities and each of their respective officers, directors, employees, agents, and insurers (collectively, the "Cree Released Parties"), from all actions, causes of action, claims, and/or demands whatsoever, in law or in equity, which any of the Watchfire Entities had, has, or may have, arising out of the Subject Parts and/or any Failed Displays incorporating any Subject Parts. Watchfire represents and warrants that neither it nor any of the Watchfire Entities has previously assigned any of the actions, causes of action, claims, and/or demands contemplated by the preceding sentence to any third party and agrees to indemnify and hold the Cree Released Parties harmless for any breach of this representation and warranty. For avoidance of doubt, the parties agree and acknowledge that the release hereunder shall not apply to any LED lighting displays or other products of the Watchfire Entities that do not incorporate any Subject Parts.

Cree agrees (for itself, all Cree Affiliates, and their respective successors and assigns) to release and forever discharge all Watchfire Entities and each of their respective officers, directors, employees, agents, and insurers (collectively, the "Watchfire Released Parties"), from all actions, causes of action, claims, and/or demands whatsoever, in law or in equity, which any of the Cree Affiliates had, has, or may have, arising out of the Subject Parts and/or the Failed Displays incorporating any Subject Parts except for the right to payment of any amounts related to the Subject Parts not offset by the credit memos as outlined in Section 1. Cree represents and warrants that neither it nor any of the Cree Affiliates has previously assigned any of the actions, causes of action, claims, and/or demands contemplated by the preceding sentence to any third party and agrees to indemnify and hold the Watchfire Released Parties harmless for any breach of this representation and warranty.

The concessions offered in this Agreement in no way constitute an admission of liability or responsibility on the part of any Cree Entity or each of their respective officers, directors,

SPD-A773-4

employees, agents, and insurers for the Subject Parts or the Failed Displays. The concessions offered in this Agreement constitute the sole and exclusive methods through which any Watchfire Entity is entitled to consideration from any Cree Entity for the Subject Parts or the Failed Displays incorporating any Subject Parts, and no Cree Entity is required to make any cash payment to any Watchfire Entity as a result of this Agreement so long as the credit memos in Section 1 are issued within the time period described in Section 1.

Each of Watchfire and Cree represents and warrants that it is authorized to bind the Watchfire Entities and the Cree Entities, respectively, to the terms and conditions of this Agreement and agrees to indemnify and hold the other party harmless for any breach of this representation and warranty.

This Agreement is personal to Watchfire and Cree. Neither this Agreement nor any rights or obligations of a party herein may be assigned, delegated, or transferred by that party, including by operation of law, without the prior written approval of the other party, and any attempted assignment, delegation, or transfer without such approval shall be void and of no effect.

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and replaces all prior agreements (whether written or oral) between the parties relating to such subject matter. Any modification and/or amendment to this Agreement must be in writing and signed by an authorized representative of each party.

The laws of the State of North Carolina shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, without regard to its conflict of laws provisions. The captions contained in this Agreement are for reference only and shall not be used in its construction or interpretation. The provisions of this Agreement shall be construed and interpreted fairly to the parties without regard to which party drafted the same.

This Agreement and any amendment hereto may be executed in counterparts, each of which when executed and delivered will be deemed to be an original and all of which counterparts taken together will constitute one and the same instrument. The exchange of copies of this Agreement or amendments hereto and of signature pages by facsimile or email transmission in portable document format, or similar format, will constitute effective execution and delivery of such instrument(s) as to the parties and may be used in lieu of the original Agreement or amendment for all purposes. Signatures of the parties transmitted by facsimile or by email transmission in portable document format, or similar format, will be deemed to be original signatures for all purposes.

It is Cree's desire to continue to develop its business relationship with Watchfire to enable the best possible success for both parties, and we hope that this Agreement evidences this desire. If you are in agreement that this Agreement reflects our complete understanding and agreement regarding the Subject Parts and the Failed Displays incorporating the Subject Parts, please have one of your authorized representatives sign below and return a copy of this letter by email to Charlie Lesko at clesko@cree.com.

Respectfully,

CREE, INC.

By: _____
Name: ___Daniel Emerson___
Title: ___EVP/GM LEDs___
Date: ___6/4/18___

Accepted and Agreed:

WATCHFIRE SIGNS, LLC

By: _____
Name: ___STEPHEN HARRIOTT___
Title: ___CEO___
Date: ___6/4/18___

# EXHIBIT B



Bill to Address
**Flextronics International**
**Europe B. V.**
**Nobelstraat 10-14, 5807 GA**

**OOSTRUM, Netherlands**

## PURCHASE ORDER

**Original**

Supplier Address
**CREE INC**
**4600 SILICON DRIVE**
**DURHAM, North carolina 27703**
**UNITED STATES**

Delivery address
**FLEXTRONICS MANUFACTURING MEX**
**S.A. DE C.V.**
**CARRETERA BASE AEREA 5850**
**B-23  COL LA MORA**
**ZAPOPAN, JALISCO 45136**
**MEXICO**

Buy-from BP  : SPC000208
Surname      : -
Telephone    : -
Fax          :

Supp.Ord.No. :
Our Order    : **377406651**
Order Date   : 23112016 00:00
Buyer        : NPI-Saul Pelayo (GDL)
Ref.         : 605426610 / HKG5023544

230P87392

| Pos Seq. | Item | | Item Description | | | |
|---|---|---|---|---|---|---|
| Quantity Unit | Price | | Unit. | Line Total | Del. Dt | Week |
| 10   0 | WFT-420007 | | LED RED CREE C4SMC-RGF  B | | | |
| 960000.0000 ea | 0.040000 USD | | ea | 38400.00 | 07-10-17 | 40 |
| **Terms of Delivery:** Ex Works | | | **Named Place:** | | | |
| **Country of Origin:** CHINA | | | | | | |
| Manufacturer: | CREE | | | | | |
| Revision  : | 01 | | MPN: C4SMC-RGF | | | |
| 20   0 | WFT-420008 | | LED GREEN CREE C4SMC-GGF  B | | | |
| 960000.0000 ea | 0.041000 USD | | ea | 39360.00 | 07-10-17 | 40 |
| **Terms of Delivery:** Ex Works | | | **Named Place:** | | | |
| **Country of Origin:** CHINA | | | | | | |
| Manufacturer: | CREE | | | | | |
| Revision  : | 01 | | MPN: C4SMC-GGF | | | |
| 30   0 | WFT-420009 | | LED BLUE CREE C4SMC-BGF  B | | | |
| 960000.0000 ea | 0.041000 USD | | ea | 39360.00 | 07-10-17 | 40 |
| **Terms of Delivery:** Ex Works | | | **Named Place:** | | | |
| **Country of Origin:** CHINA | | | | | | |
| Manufacturer: | CREE | | | | | |
| Revision  : | 01 | | MPN: C4SMC-BGF | | | |

Buy-from BP : SPC000208      Order:  377406651   Purchase Office: P37701 GDL Purchase Office              Date: 18-09-19

| Pos Seq. | Item | | Item Description | | | | |
|---|---|---|---|---|---|---|---|
| Quantity Unit | | Price | | Unit. | Line Total | Del. Dt | Week |

| Goods | Costs L.Pmt.Surc | | | | Total USD |
|---|---|---|---|---|---|
| 117120.00 | 0.00 | 0.00 | | | 117120.00 |

Payment :
Please state our order number, position and item number on all invoices and packing slips.

STANDARD TERMS AND CONDITIONS OF PURCHASE

1. REVOCATION AND EFFECT OF ORDER. This purchase order ("Order") may be revoked at any time prior to Flex' receipt of written acceptance by Seller. This Order expressly limits acceptance to the terms of this Order and Flex hereby objects to any different or additional terms contained in any response to this Order. To the extent that this Order might be treated as an acceptance of Seller's prior offer, such acceptance is expressly made on condition of assent by Seller to the terms hereof, and the shipment of the products covered by this Order ("Goods") or work performed by Seller ("Services") shall constitute such assent. In addition to the other terms in this Order, this Order expressly includes all implied warranties and all of Flex' remedies set forth in the Uniform Commercial Code and similar laws in other countries. The terms of this Order are the sole and exclusive terms on which Flex agrees to be bound.

2. DELIVERY. Time is of the essence in this Order. Delivery of the Goods and performance of any Services shall be made pursuant to the schedule, via the carrier, and to the place specified on the face hereof unless changed by written instructions from Flex prior to shipment or performance. Seller shall promptly inform Flex of any anticipated delay in shipment or performance. Flex reserves the right to return, shipping charges collect, all Goods received more than three (3) business days in advance of the specified delivery date or after the specified delivery date. If this Order calls for delivery in installments and Seller fails to deliver an installment on the designated delivery date, Flex may decline to accept subsequent installments and terminate the balance of this Order.

3. SHIPPING INSTRUCTIONS. Unless otherwise specified on the face hereof, all Goods shall be packaged by Seller in suitable containers to permit safe transportation and handling. Each delivered container must be labeled and marked to identify contents without opening, and all boxes and packages must contain packing sheets listing contents. Flex's purchase order number, as well as Flex's part number(s), must appear on all shipping containers, packing sheets, delivery tickets, and bills of lading. All Goods shall be shipped on carriers certified compliant with C-TPAT (Customs-Trade Partnership Against Terrorism).

4. TITLE AND RISK OF LOSS. Unless otherwise specified on this Order, Goods shall be delivered DDP Flex's location designated on the face hereof (Incoterms 2010), at which time title and risk of loss on the Goods shall pass to Flex. If any of the ordered Goods are destroyed or materially damaged prior to the time risk of loss passes to Flex, Flex may cancel this Order as to the destroyed or materially damaged Goods or require the prompt delivery of substitute Goods of equal quantity and quality.

5. PRICE AND PAYMENT. The price to be paid by Flex for the Goods shall be that stated on the face hereof. Payment terms shall be net ninety (90) days from Flex' receipt of Goods or, if applicable, acceptance of Services unless otherwise specified on the face hereof. Seller shall submit invoices by either Electronic Data Interchange ("EDI") or Vendor Portal ("VPL"). Requirements can be found on the following website: https://www.flex.com/supplier-information/e-commerce. Seller invoices must list only one Flex item number and one Flex purchase order number, unless the invoices are for "maintenance, repair and operations" ("MRO") items or bin stocking programs. Unless otherwise specified on the face hereof, the price of the Goods includes all shipping charges, taxes, VAT, duties and packaging. Personal property taxes assessable upon the Goods prior to the receipt by Flex shall be borne by Seller.

6. INSPECTION. Flex shall have thirty (30) days from the date of receipt of the Goods for inspection and acceptance testing. Any Goods not rejected during that initial 30-day period shall be deemed accepted.

7. WARRANTIES. Seller warrants to Flex and its customers that it shall perform all Services hereunder in a competent and professional manner in accordance with the terms of this Order, industry accepted standards and all applicable laws and that the Goods shall be free of liens, new and unused, perform in accordance with all applicable specifications, including Seller's published specifications, and be free from defects in materials, workmanship and design for a period of two (2) years from Flex' receipt of such Goods. Seller further warrants it has the capability, experience, registrations, licenses, permits, and governmental approvals required to sell the Goods and perform the Services. Seller will perform the Services in a timely, efficient, professional and workmanlike manner in accordance with the applicable Order and to Flex' satisfaction. Services include all incidental services and tasks necessary to perform the Order and provide acceptable Services. All Services shall be deemed "works made for hire". To the extent any of the Services are not deemed "works made for hire" by operation of law, Seller hereby irrevocably assigns, transfers and conveys to Flex without further consideration all of its right, title and interest in such Services, including any related or accompanying documentation and any software or other goods necessary for the provisions of the Services, and all rights of patent, copyright, trade secret or other proprietary rights in such materials. Seller acknowledges that Flex shall have the right to obtain and hold in their own name the intellectual property rights in and to such Services and software. Without limiting Flex' right to pursue any applicable remedies, Goods not meeting this warranty may in particular be returned to Seller for credit or replacement at Seller's expense, and at Flex' option, and Services not meeting this warranty shall be re-performed or fees reimbursed, at Flex' option. Excessive Failure: Should Goods shipped in any ninety (90)-day period to Flex or should all Goods cumulatively received by Flex experience a failure rate of the lesser of any defective-part-per-million

specified in the Order or more than zero point three per cent (0.3% = 3000 DPPM's) from the same defect or more than zero point
five percent (0.5% = 5000 DPPM's) from cumulative defects, Seller shall prepare a plan for diagnosing and addressing the problem
and will be responsible for all costs incurred by Flex and its customers in rectifying such failures, including, without
limitation, for engineering changes, testing and field-recovery costs, as well as for all damages.

8. ITEMS FURNISHED BY FLEX. Unless otherwise specified by Flex in writing, all designs, tools, patterns, drawings, data, materials,
and equipment supplied to Seller or paid for by Flex shall remain the property of Flex, shall be used only for making the Goods or
performing the Services for Flex, shall be insured by Seller at replacement value, and shall be returned to Flex in good condition
upon completion of this Order. Seller assumes all responsibility for the accuracy of tooling used in the production of the Goods or
performance of Services, whether such tooling is fabricated by Seller or furnished by Flex.

9. INDEMNITY. Seller agrees to indemnify, defend and hold Flex and its customers harmless from and against any and all claims,
actions, losses, expenses, damages, penalties, fines, liabilities and settlements arising from any actual, alleged or threatened
third-party claims relating to (a) any infringement, misappropriation or violation on the part of Seller's Goods or Services of any
third party's patent, copyright, trade secret, mask work, trademark, trademark rights or any other intellectual property right, (b)
personal injury or property damage caused by the Goods or Services, (c) defects in the Goods or Services which amount to a breach
of Seller's warranties in Section 7 or 15; (d) breach of Section 16, or (e) as a result of any negligent or reckless act or willful
misconduct of the Seller.

10. CHANGES. Flex may, by purchase order amendment issued to Seller, change (a) the method of shipment or packing, (b) the
drawings, designs, or specifications, (c) the place of delivery, or (d) the shipment date. Seller shall promptly inform Flex of any
modifications to the delivery schedule necessitated by the changes. If any Goods are designated non-cancelable/non-returnable
("NCNR"), Flex may reschedule the delivery of any NCNR Goods at any time up to the time of shipment for a period of up to ninety
(90) days beyond the delivery date, and Flex shall not have any liability for any costs associated with such rescheduling. Within
three (3) days from receipt of a purchase order amendment, Seller shall notify Flex in writing of any increase or decrease in the
cost of performance caused by a purchase order amendment and provide supporting documentation. Flex shall make an equitable
adjustment in the Order to reflect valid cost variances due to the changes requested by Flex. Seller shall advise Flex in writing
of any foreseeable part shortages, and shall advise Flex not less than one (1) year in advance of any changes that might affect
Seller's ability to accept Flex' purchase orders

11. TERMINATION AND REMEDIES. Flex may terminate this Order in whole or in part at any time by written notice to Seller, even Orders
in which Goods are designated as NCNR. Seller will thereupon immediately (a) stop work on the cancelled Goods or Services; (b)
notify its subcontractors to do likewise; (c) cancel orders for components for the cancelled Goods or Services; (d) return unneeded
components for cancelled Goods to their suppliers or divert such components to jobs for other customers; and (e) otherwise mitigate
all non-returnable, unneeded components for cancelled Goods or Services. Seller shall not be entitled to compensation for cancelled
Goods. Except for termination due to default or delay of Seller, Seller shall be entitled to commercially reasonable compensation
for NCNR Goods on hand at the termination date as follows: Flex will purchase (a) finished Goods at the Order price, (b)
work-in-process Goods at a reasonable pro-rata percentage of the finished Goods Order price and (c) custom components for the
cancelled Goods, which Seller properly ordered and was not able to cancel, return, or otherwise mitigate using diligent efforts
within ninety (90) days after cancellation, at Seller's cost for such custom components. The total compensation paid by Flex for
such cancellation shall not exceed the price on the Order for the cancelled Goods. In the event that Flex breaches its obligations
under this Order, and fails to cure within a commercially reasonable time after receiving written notice of such default, Seller's
sole and exclusive remedy shall be to receive direct damages for the Goods in question as if such Goods were cancelled, computed in
the manner set forth in the fourth sentence of this section. In no event shall Seller be entitled to indirect, incidental,
consequential, special, or punitive damages or loss of profit, for Flex's breach of the terms and conditions of this Order, or for
any other act or omission occurring as a result of Flex' breach of its performance obligations under this Order.

12. WAIVER. No claim or right arising out of the breach of this Order by Seller can be discharged by a waiver of the claim or right
by Flex unless the waiver is supported by consideration and is in writing signed by Flex.

13. ASSIGNMENT. Seller shall not assign its rights or obligations under this Order without the advance written consent of Flex.
Flex may assign its rights under this Order to a subsidiary or affiliate upon written notice to Seller.

14. CONFIDENTIALITY. Neither party shall, without first obtaining the other's written permission, advertise, publish, or disclose
the terms, details, pricing or specifications of this Order, the amount of revenue generated or to be generated from this Order,
nor will either party communicate the fact that Seller has furnished or has contracted to furnish Flex with the Goods or Services.
Both parties agree to maintain in confidence those materials and information either has designated as being confidential or
proprietary information.

15. QUALITY REQUIREMENTS. Seller shall comply, and shall cause all Goods and Services to comply, with all applicable quality

requirements set forth at http://www.Flex.com/supplier-information/supplier-quality, which are incorporated into this Order.
16. COMPLIANCE WITH LAWS. Seller shall comply with all applicable laws concerning the materials content and the manufacture and distribution of Goods and performance of Services, and shall ensure that its activities in performance of this Order in connection with this Order shall not cause Flex to be in violation of any laws, including without limitation applicable import or export laws, packaging regulations including the ISPM 15 "Requirements of Wood Packaging Materials", social responsibility code of conduct requirements (including, upon request, submission of compliance proof to the EICC requirement through either submission of a self-assessment questionnaire administered by either a 3rd party affiliated with the EICC organization or Flex), and any applicable supply chain security guidelines of the countries in which Flex conducts business.
U.S. Government Contracting:  Where the Goods or Services being procured from Seller are in support of a U.S. government contract or end-customer, the supplemental terms and condition at https://www.Flex.com/supplier-information shall apply to this Order.
Social Responsibility: Seller agrees to comply with the Electronic Industry Code of Conduct ("EICC") found at:
  http://www.eiccoalition.org/
Anti-Terrorism Security Measures: Seller warrants it is in compliance with and will cause each of its subcontractors and suppliers to comply with (1) all applicable laws relating to anti-terrorism security measures and (2) all Supply Chain Security guidelines as defined by the importing country, including but not limited to: C-TPAT (Customs-Trade Partnership Against Terrorism) as published by the United States, the STP (Secure Trade Program) as published by Singapore, and the AEO (Authorized Economic Operator) as published by the European Union. Supplier warrants that all eligible locations shipping to Flex are registered to all applicable Known Shipper programs.
Anti-Corruption Measures: Seller warrants that in supplying any Goods and performing any work under this Order, Seller, its affiliates and agents have not and will not pay, offer or promise to pay, or authorize the payment, directly or indirectly, of any money or anything of value to any government official, government employee, political party or candidate for political office for the purpose of influencing any act or decision of such person or of the government to obtain or retain business, or direct business to any person or business. Seller further warrants it, its affiliates and its agents have not and will not pay, offer or promise to pay, or authorize the payment directly or indirectly, of any money or anything of value to any employee of Flex to obtain or retain business.
Seller agrees to report any suspected violation of the EICC Code of Conduct to Flex at: http://www.ethicspoint.com.
17. DISPUTE RESOLUTION. Any dispute arising out of or relating to this Order shall be settled by binding arbitration under the applicable rules and procedures of the arbitration bodies listed as follows. This clause shall not preclude parties from seeking provisional remedies from a court of appropriate jurisdiction. For any Flex buying entity incorporated in the Americas, California laws apply, excluding those portions relating to conflicts of laws. Disputes will be settled before JAMS ("JAMS"), with the mandatory site for arbitration in San Jose, California. For any Flex buying entity incorporated in China, the laws of the People's Republic of China apply and disputes will be settled before the China International Economic and Trade Arbitration Commission ("CIETAC"), with the mandatory site for arbitration in Beijing. For any Flex buying entity incorporated in North Asia (excluding China), the laws of the Special Administrative Region of Hong Kong apply and disputes will be settled before the Hong Kong International Arbitration Centre ("HKIAC"), with the mandatory site for arbitration in Hong Kong. For any Flex buying entity incorporated in South Asia or South East Asia, Singapore laws apply and disputes will be settled before the Singapore International Arbitration Centre ("SIAC"), with the mandatory site for arbitration in Singapore. For any Flex buying entity incorporated in the Europe, Middle East, and Africa (EMEA) regions, the laws of Austria apply, excluding those portions relating to conflicts of laws, and all disputes arising out of or in connection with the Order shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said Rules, with the mandatory site for arbitration in Vienna, Austria. The United National Convention on Contracts for the International Sale of Goods shall not apply. To the extent that a court of competent jurisdiction or arbitral panel reasonably determines that a local law must apply (notwithstanding the express choices of law described in this Section 17), the parties agree and acknowledge that the application of such local law shall be limited in scope and narrowly tailored to apply in a limited context, and that thereafter all disputes shall be otherwise governed by this Section 17 as well as by the express arbitration provisions set forth herein. The language of arbitration shall in all cases be English. The parties hereby knowingly and voluntarily, and having had an opportunity to consult with counsel, waive all rights to trial by jury.
18. INTENDED BENEFICIARIES. Seller agrees that Flex customers are intended "creditor" beneficiaries of Sections 7 9, 15, and 16.
19. INTERPRETATION. As a result of accepting Flex' Order, Seller acknowledges that this Order, including the provisions on its face, contains the entire agreement between the parties concerning the purchase and sale of the Goods or provision of Services, or both, as applicable, unless the parties have otherwise negotiated and executed an overriding agreement, in which case the terms in such agreement shall take precedence. Except to the extent Flex has relied upon statements and writings of Seller and Seller's

# PURCHASE ORDER

Page 6

Buy-from BP : SPC000208      Order: 377406651    Purchase Office: P37701 GDL Purchase Office                    Date: 18-09-19

agents in connection with this Order, there are no oral understandings, representations, or agreements relative to this Order which are not fully expressed herein. Seller warrants that Seller is familiar with and agrees to be bound by this Order and all supplier quality requirements, which may be found on the following website:

http://www.Flex.com/supplier-information/supplier-quality.

Flex requires high ethical standards from employees and suppliers. Report suspected violations to the Flex Ethics Hotline: http://www.ethicspoint.com

Standard Terms and Conditions of Purchase                    Rev.: O

Buyer Signature:    _____

Approval Signature:  _____

# EXHIBIT C

# CREE

## SALES TERMS AND CONDITIONS

Unless otherwise specifically agreed to in writing by Seller, these Sales Terms and Conditions shall apply to any and all orders placed by Buyer for products or services of Seller. In these sales terms and conditions, the Cree company designated in Seller's order acknowledgement is referred to as "Seller" and the party to whom Seller's order acknowledgement is addressed is referred to as "Buyer."

1. **ACCEPTANCE OF ORDERS.** Seller's acceptance of all orders and all offers and sales by Seller are subject to and expressly conditioned upon Buyer's assent to the terms and conditions of this Agreement. The Agreement consists of these sales terms and conditions, Seller's quotation, if any, and Seller's order acknowledgement. Buyer's acceptance of any offer by Seller must be made on such terms and conditions exactly as offered by Seller. Any of Buyer's terms and conditions which are different from or in addition to those contained in this Agreement are objected to by Seller and shall be of no effect unless specifically agreed to in writing by Seller. Commencement of performance or shipment shall not be construed as acceptance of any of Buyer's terms and conditions which are different from or in addition to those contained in the Agreement. If a contract is not earlier formed by mutual agreement in writing, acceptance by Buyer of products or services furnished by Seller pursuant hereto shall be deemed Buyer's assent to all of the terms and conditions of this Agreement.

This Agreement shall be governed by the laws of the State of New York as if made and to be performed entirely within such state.

2. **PRICES.** The prices stated in this Agreement do not include transportation, insurance or any sales, use, excise or other taxes, duties, fees or assessments imposed by any jurisdiction. All applicable taxes will be paid by Buyer, unless Buyer provides Seller with appropriate tax exemption certificates. Any amounts paid at any time by Seller that are the responsibility of Buyer shall be invoiced to Buyer and reimbursed to Seller. All prices and other terms are subject to correction for typographical or clerical errors.

3. **TERMS OF PAYMENT.** All payments shall be in U.S. dollars. Buyer shall pay for products in cash upon delivery, unless an earlier or later time for payment is specified in the order acknowledgement (in which case payment shall be due at the time so specified). Each shipment shall be considered a separate and independent transaction and payment for each shipment shall be due accordingly.

Seller may, at its option, elect to extend credit to Buyer. If Seller extends credit to Buyer, invoices will be issued upon shipment and payment shall be due in full within thirty (30) days from the invoice date or such other date specified in the Agreement. Seller reserves the right to change the amount of or withdraw any credit extended to Buyer.

Unless otherwise specified in this Agreement or agreed to in writing by Seller, amounts owed for services will be invoiced monthly or, if sooner, upon completion of the work. Payment of such invoices is due within thirty (30) days from the invoice date. Amounts not paid when due shall be subject to interest at the rate of one and one-half percent (1½%) per month or, if less, the maximum rate permitted by law.

In the event of the bankruptcy or insolvency of Buyer, or the filing of any proceeding by or against Buyer under any bankruptcy, insolvency or receivership law, or in the event Buyer makes an assignment for the benefit of creditors, Seller may, at its election and without prejudice to any other right or remedy, exercise all rights and remedies granted Seller in Section 7 as in the case of a default by Buyer under this Agreement.

4. **DELIVERY, TITLE AND RISK OF LOSS.** Unless otherwise agreed to in writing by Seller, products shall be shipped EXW Seller's manufacturing facilities or inventory hub (Incoterms 2010) to any location designated by Buyer (subject to Section 15) and shall be deemed delivered to Buyer when delivered to the transportation company at the shipping point. Unless otherwise agreed to in writing by Seller, all transportation charges and expenses shall be paid by Buyer, including the cost of any insurance against loss or damage in transit which Seller may obtain at Buyer's written request. Seller reserves the right to ship products freight collect.

Seller hereby reserves, and Buyer hereby grants to Seller, a purchase money security interest in all products purchased under this Agreement, together with all proceeds thereof, including insurance proceeds. Such security interest secures all of Buyer's obligations arising under this Agreement, and any other agreements between Buyer and Seller, until all amounts due Seller hereunder have been paid in full. Buyer agrees upon Seller's request to sign appropriate financing statements evidencing Seller's security interest.

Subject to the security interest reserved to Seller, title and risk of loss and/or damage to products shall pass to Buyer upon delivery of the products to the transportation company at the shipping point. Confiscation or destruction of or damage to products shall not release, reduce or in any way affect the liability of Buyer. In the event Buyer rejects or revokes acceptance of any products for any reason, all risk of loss and/or damage to such products shall nonetheless remain with Buyer unless and until the same are returned at Buyer's expense to such place as Seller may designate in writing.

All products must be inspected upon receipt and claims filed by Buyer with the transportation company when there is evidence of shipping damage, either concealed or external.

5. **PERFORMANCE.** Seller will make a reasonable effort to observe the dates specified herein or such later dates as may be agreed to by Buyer for delivery or other performance, but Seller shall not be liable for any delay in delivery or failure to perform due to acceptance of prior orders, strike, lockout, riot, war, fire, act of God, accident, delays caused by any subcontractor or supplier or by Buyer, technical difficulties, failure or breakdown of machinery or components necessary for

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree 销售条款及条件（中文版）**

order completion, inability to obtain or substantial rises in the price of labor or materials or manufacturing facilities, curtailment of or failure to obtain sufficient electrical or other energy supplies, or compliance with any law, regulation, order or direction, whether valid or invalid, of any governmental authority or instrumentality thereof, or due to any circumstances or any causes beyond its reasonable control, whether similar or dissimilar to the foregoing and whether or not foreseen. As used herein, "performance" shall include, without limitation, fabrication, shipment, delivery, assembly, installation, testing and warranty repair and replacement, as applicable.

Buyer agrees that any delay in delivery or failure to deliver or perform any part of this Agreement shall not be grounds for Buyer to terminate or refuse to comply with any provisions hereof and no penalty of any kind shall be effective against Seller for such delay or failure; provided, however, that if the delay or failure extends beyond six (6) months from the originally scheduled date either party may, with written notice to the other, terminate this Agreement without further liability for the unperformed part of this Agreement.

6.  **ACCEPTANCE.**  All products delivered hereunder shall be deemed accepted by Buyer as conforming to this Agreement, and Buyer shall have no right to revoke any acceptance, unless written notice of the claimed nonconformity is received by Seller within twenty (20) days of delivery thereof.

7.  **DEFAULT AND TERMINATION.**  Buyer may terminate this Agreement if Seller materially defaults in the performance of its obligations hereunder and fails to cure such default within sixty (60) days after written notice thereof from Buyer.   Such termination shall be Buyer's sole remedy in the event of a default by Seller.

Buyer shall be deemed in material default under this Agreement if Buyer fails to pay any amounts when due hereunder, cancels or attempts to cancel this Agreement prior to delivery or refuses delivery or otherwise fails to perform any of its obligations hereunder or fails to pay Seller any sums due under any other agreement or otherwise.  In the event of a material default by Buyer, Seller may, upon written notice to Buyer, (1) suspend its performance and withhold shipments, in whole or in part, (2) terminate this Agreement, (3) declare all sums owing to Seller immediately due and payable, and/or (4) recall products in transit, retake same and repossess any products held by Seller for Buyer's account, without the necessity of any other proceedings, and Buyer agrees that all products so recalled, taken or repossessed shall be the property of Seller, provided that Buyer is given credit therefor. Exercise of any of the foregoing remedies by Seller shall not preclude exercise of any of the others, and neither the existence nor exercise of such remedies shall be construed as limiting, in any manner, any of the rights or remedies available to Seller under the Uniform Commercial Code or other laws.

8.  **PATENTS AND OTHER INTELLECTUAL PROPERTY RIGHTS.**  To the extent that the products include silicon carbide or Group III-nitride based semiconductor wafers (including semi-insulating wafers and epiwafers), Buyer may use the purchased wafers for research, development and production in all fields other than the bulk growth of silicon carbide and Group III-nitride based materials.  As a condition of sale, Buyer warrants that it will not use any of the purchased wafers in the bulk growth of silicon carbide or Group III-nitride based materials or in the

development of processes for bulk growth of such materials. Growth of one or more silicon carbide or Group III-nitride epitaxial layers on a single substrate having an aggregate epitaxial thickness of less than 150 microns will not be considered bulk growth for purposes of this Agreement.  Buyer may not transfer the wafers to a third party before dicing unless Buyer gives the third party written notice of the limited license in substantially the following form: "This material is licensed for limited use and may not be used for the bulk growth of silicon carbide or Group III-nitride based materials or the development of processes for bulk growth of such materials."

The sale of products or provision of services hereunder does not convey any express or implied license under any patent, copyright, trademark or other proprietary rights owned or controlled by Seller, whether relating to the products sold or any manufacturing process or other matter.  All rights under any such patent, copyright, trademark or other proprietary rights are expressly reserved by Seller.  Furthermore, Buyer agrees not to infringe, directly or indirectly, any patents of Cree, Inc. or its subsidiaries with any combination or system incorporating a product sold hereunder.

Seller will defend any suit or proceeding brought against Buyer insofar as such suit or proceeding is based on a claim that the design or manufacture of products furnished hereunder which were manufactured solely to Seller's designs and specifications infringe any U.S. patent issued as of the date of shipment, provided Seller is promptly notified in writing of such suit or proceeding and is given full authority, information and assistance by Buyer for such defense.  Seller will pay all damages and costs based on such claim of infringement which are finally awarded against Buyer in any such suit or proceeding or paid by way of settlement, but Seller shall have no liability whatsoever with respect to any settlement made by Buyer without Seller's prior written consent, which Seller may withhold in its sole discretion.  If such products are held to infringe any U.S. patent and their use or sale is enjoined, or if in the opinion of Seller such products are likely to become the subject of such a claim of infringement, Seller may, in its sole discretion and at its own expense, either procure a license which will protect Buyer against such claim without cost to Buyer, replace such products with non-infringing products, or require return of such products and refund an equitable portion of the price paid by Buyer to Seller for such products.

The foregoing states Seller's sole liability for any claim based upon or related to any alleged infringement of any patent or other intellectual property rights.  Seller shall have no liability for any claim of infringement or damages based on a combination of products furnished under this Agreement with products, equipment or materials not furnished hereunder, or based upon any items made with the products furnished under this Agreement.

Buyer shall defend and hold Seller harmless against any expense, loss, costs or damages resulting from any claimed infringement of patents, trademarks or other intellectual property rights arising out of compliance by Seller with Buyer's designs, specifications or instructions.

9.  **LIMITED WARRANTY.**  Seller warrants that its products furnished under this Agreement will conform to and perform in accordance with Seller's published specifications for such products as in effect on the date of shipment (within the

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree 销售条款及条件（中文版）**

Page 2
第 2 页

deviations specified therein) for a period of ninety (90) days from such date; provided, however for Seller's light emitting diode module products, the period shall be the earlier of (a) five (5) years and six (6) months after the date the products are shipped by Seller to Buyer or (b) five (5) years after the date the products are shipped by Buyer to its customer. Seller's liability and Buyer's sole remedy under this warranty is limited to repair or replacement of items determined by Seller to be defective or, at Seller's sole option, refund of the purchase price paid to Seller for such items. Seller shall have no liability under this warranty unless Seller is notified in writing promptly upon Buyer's discovery of the defect and the defective items are returned to Seller, freight prepaid, and received by Seller not later than ten (10) days after expiration of the warranty period.

This warranty shall not apply to any defect or failure to perform resulting from misapplication, improper installation, improper operation, abuse or contamination, whether internal or external, and Seller shall have no liability of any kind for failure of any equipment or other items in which the products are incorporated. This warranty shall not apply to products manufactured by Seller to Buyer's designs or specifications, and no warranty is given as to such non-standard products unless otherwise specifically agreed to in writing by Seller.

Seller warrants to Buyer that services provided hereunder will be performed in a reasonable, workmanlike manner. Seller will have no liability under this warranty unless Seller is given written notice of the claimed breach and a description thereof within ninety (90) days after the service is rendered. Seller's entire liability and Buyer's sole remedy under this warranty shall be limited to the provision of such remedial or replacement services as Seller reasonably determines necessary to correct the breach.

**THE FOREGOING WARRANTY PROVISIONS ARE EXCLUSIVE AND ARE GIVEN AND ACCEPTED IN LIEU OF ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY AGAINST INFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

Remedies of Buyer for any breach of warranty are limited to those provided herein to the exclusion of all other remedies, including, without limitation, incidental or consequential damages. No warranty or agreement varying or extending the foregoing warranty and limitation of remedy provisions may be relied upon by Buyer unless it is in writing and signed by the President or a Vice President of Seller. No representation or affirmation of Seller, whether by words or action, shall be construed as a warranty. If any model or sample was shown to Buyer, such model or sample was used merely to illustrate the general type and quality of the products and not to represent that the products would necessarily conform to the model or sample.

10. **LIMITATION OF LIABILITY AND CLAIMS. SELLER'S AGGREGATE LIABILITY IN DAMAGES OR OTHERWISE SHALL IN NO EVENT EXCEED THE AMOUNT, IF ANY, RECEIVED BY SELLER HEREUNDER. IN NO EVENT SHALL SELLER BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL LOSS OR DAMAGES OF ANY KIND, HOWEVER CAUSED, OR ANY PUNITIVE, EXEMPLARY OR OTHER DAMAGES. NO ACTION, REGARDLESS OF FORM, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR PRODUCTS OR SERVICES FURNISHED BY SELLER MAY BE BROUGHT BY BUYER MORE THAN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUED.**

11. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement of the parties and supersedes all prior negotiations, proposals, agreements and understandings, whether oral or written, relating to the products to be purchased hereunder or otherwise relating to the subject matter of this Agreement. Any representation, warranty, course of dealing or trade usage not expressly contained or referenced herein shall not be binding on Buyer.

12. **ATTORNEY'S FEES.** In the event of default in payment of the purchase price or any part thereof, Buyer agrees to pay Seller's expenses, including reasonable attorney's fees and expenses, incurred by Seller in enforcing payment thereof, including all expenses incurred in connection with any arbitration or judicial proceeding.

13. **ARBITRATION.** Any controversy or claim (including, without limitation, any claim based on negligence, misrepresentation, strict liability or other basis) arising out of or relating to this Agreement or its performance or breach, which involves an amount in excess of $50,000 (exclusive of interest and costs), shall be settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce, if arbitration is demanded by either party. The location of the arbitration shall be the City of Raleigh, North Carolina if Seller's principal office is located in the United States, or Hong Kong if Seller's principal office is located outside of the United States. The decision in such arbitration shall be final and binding and any award rendered thereon may be entered in any court having jurisdiction.

14. **ASSIGNMENT.** Buyer shall not assign or transfer any rights or claims under this Agreement without the prior written consent of Seller, and any purported assignment made without such consent shall be void. This Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of the parties.

15. **EXPORT CONTROL.** Seller's export of the products, and any technical information related thereto, may be subject to United States and/or other national or international (e.g., UN) laws and regulations controlling the export and re-export of technical data and products, or limiting the export of certain products to specified countries (e.g., embargo regulations). Seller shall not be obligated under these Sales Terms and Conditions to export, transfer or deliver any products or related technical information to Buyer if prohibited by applicable law or until all necessary governmental authorizations have been obtained. Seller shall not be liable under these Sales Terms and Conditions for any expenses or damages resulting from failure to obtain or delays in obtaining any required government authorizations. Buyer shall comply fully with all export administration and control laws and regulations of the U.S. government and/or other national or international (e.g. UN) laws and regulations as may be applicable to the export, re-export, resale or other disposition of any products purchased from Seller.

16. **PRODUCT SAFETY.** Buyer shall comply fully with all industry safety standards applicable to the manufacture, distribution or sale of items incorporating the products supplied

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree 销售条款及条件（中文版）**

Page 3
第 3 页

by Seller, including but not limited to American National Standards Institute (ANSI)/Illuminating Engineering Society of North America (IESNA) RP-27 (or equivalent eye safety labeling standards) and International Standard IEC 62471-2006, published by the International Electrotechnical Commission, including all marking, labeling, and supplemental user and service information (if any) required by the standards, where applicable. Buyer shall comply fully with all applicable safety-related laws, rules and regulations of any governmental body having jurisdiction to regulate the manufacture, distribution or sale of items incorporating the products supplied by Seller. Buyer shall obligate all persons and entities buying such products from Buyer (other than end users) to comply with such industry standards, laws, rules or regulations applicable to such person or entity. Buyer shall defend and hold Seller harmless against any expense, loss, costs or damages relating to any claimed failure by Buyer to comply with such industry standards, laws, rules or regulations or from any bodily injury, illness or property damage resulting from products manufactured by Buyer which incorporate the products supplied by Seller.

17. **GENERAL**. If the products purchased from Seller are to be used in the performance of a government contract or subcontract, no government requirements or regulations shall be binding upon Seller unless specifically agreed to by Seller in writing. No modification, amendment, rescission, waiver or other change in this Agreement shall be binding on Seller unless agreed to in writing by Seller. The invalidity or unenforceability, in whole or in part, of any provision herein shall not affect the validity or enforceability of any other provision herein. Failure or delay on the part of either party to exercise any right, power, privilege or remedy herein shall not constitute a waiver thereof. The section headings contained herein are for convenience of reference only and are not to be used in the construction or interpretation of this Agreement.

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree** 销售条款及条件（中文版）

Page 4
第 4 页

# Cree

## 銷售條款及條件

除非賣方另以書面形式明確同意，否則本銷售條款及條件適用於買方就賣方產品或服務所下之任何及全部訂單。就本銷售條款及條件而言，賣方之訂單確認中指明的Cree公司乃指「賣方」，而賣方訂單確認之收件人則為「買方」。

1.接受訂單。賣方待買方同意有關訂單協議之條款及條件後，並明確以此為條件，方接受其全部訂單及全部要約和銷售。該協議由本銷售條款及條件、賣方報價(如有)及賣方訂單確認組 成。買方須嚴格按照賣方提出的相關條款及條件接受賣方的任何 要約。賣方一概反對與該協議所載條款及條件有 或作為其增補的任何買方條款及條件，且除非賣方另以書面形式明確同意，否則該等條款及條件一 無效。開始 約或裝運 得被解釋為接受與該協議所載條款及條件有 或作為其增補的任何買方條款及條件。如賣方未有提前以書面協議形式訂 合約，則買方接受賣方根據本銷售條款及條件提供之產品或服務應視作賣方同意該協議之全部條款及條件。

該協議受 約州法 管限，猶如該協議完全於該州訂 及 。

2.價格。該協議所述價格 包括運輸、保險或任何司法管轄區徵收的任何銷售稅、使用稅、消費稅或其他稅項、關稅、收費或 評稅。除非買方向賣方提供相關免稅證明，否則所有適用稅款 均將由買方支付。賣方於任何時間代買方支付的任何款項，均須向買方開具發票並由買方償付予賣方。所有價格及其他條款均可作出排版錯誤或筆誤修正。

3.支付條款。所有款項均須以美元支付。買方須於交付後以現 支付產品款項，訂單確認中指定提前或押後支付者除外(在該情況下，須在如此指定之時間支付)。各項裝運應被視為分開的獨 交 ，且各項裝運應據此付款。

賣方或可自 選擇向買方提供信貸。如賣方向買方提供信貸，則將在裝運後開具發票，且須在發票日期後三十(30)天內或該協議指定的此 其他日期悉 付款。賣方保 改向買方所提供之信貸額或撤回該信貸的權 。

 除非該協議另有指明或賣方另 書面同意，否則欠付之服務款項將按月出具發票或待工作完成後 出具發票(取較早者)。該等 發票須在發票日期後三十(30)天內支付。

到期未付之款項須每月按百分之一點五(1½%)或法 允許的最高 (取較小者)支付 息。

一旦買方破產或無 償債，或根據任何破產、無 償債或接管法 由買方或針對買方提呈任何法 程序，或如買方為債權人 益作出轉讓，則在買方違反該協議的情況下，賣方可在 損害任何其他權 或補救的前提下自 選擇 使第7節授予買方的全部權 及補救。

4.交付、所有權及損失風險。除非賣方另以書面形式同意，否則產品須以賣方生產工廠或存貨中心EXW(《2010 國際貿 術語解釋通則》)方式運至買方指定的任何地點(受第15節規限)，並須在於裝船地點交付予運輸公司時視為已交付予買方。除非賣方另以書面形式同意，否則所有運輸費用及支出均須由買方支付，當中包括賣方應買方書面要求，就運輸途中的任何損失或損壞而或會投保的保險費用。賣方保 以運費到付方式運送產品的權 。

就根據該協議購買的所有產品 同由此產生的所有收益(包括保險賠款)，賣方特此保 (且買方特此授予賣方保 )當中的價款擔保 益。該等擔保 益擔保買方在該協議及買方與賣方之 間任何其他協議下產生的所有義務，直至賣方在該協議下之應收款項獲悉 支付為止。應買方要求，買方同意簽署證明賣方擔保 益的相關融資聲明。

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree 銷售条款及条件（中文版）**

Page 1
第 1 页

基於擔保　益由賣方保　，故產品的所有權及損失和／或損壞風險在產品於裝船地點交付予運輸公司時，即轉嫁至買方。沒收或銷毀產品或產品損壞概　免除、減輕　或以任何方式影響買方的法責任。如買方因故拒絕或取消承兌任何產品，該等產品的所有損失及／或損壞風險向歸於買方，除非自直至該等產品運回至賣方或會書面指定的地點（費用買方承擔）。

如有證據顯示存在裝運損壞(　隱藏於內或外部)，則所有產品須在買方收到並向運輸公司申報後進　檢驗。

5.　約。賣方將作出合　努　以遵守本銷售條款及條件指定的交付或其他　約日期或買方同意的此　稍後日期，但對於因接受之前訂單、罷工、停工、　動、戰爭、火災、　可抗、意外事件而造成延遲交付或未能　約，以及因任何分包商或供應商或買方造成的延誤、技術困難、完成訂單所需機械或部件失　或故障、未能獲取　動　或原材　或生產設施或其價格大幅提升、縮　減或未能獲得足夠電　或其他能源供應，或遵守任何政府機構或其執　部門任何法　、法規、命　或指(　是否有效)，或因超出其合　控制範圍的任何情形或任何原因(　是否與前述者相似且　是否可預　)而引起的延額，賣方概　負責。本銷售條款及條件所用的「　約」包括(但　限於)製造、裝運、交付、裝配、安裝、測試及保修和　換(如適用)。

買方同意，延誤交付或未能交付或部分　該協議均　應作為買方終止或拒絕遵守當中任何條文的　由，且概　得因此　延誤或失責而對賣方採取任何形式的處罰；惟倘超過原定日期　(6)個月以上仍未交付，則任何一方可書面通知對方終止該協議，而無需就該協議未　部分承擔進一步法　責任。

6.承兌。據本銷售條款及條件交付的所有產品均須視為買方按照該協議承兌，且買方無權撤回任何承兌，賣方在交付產品後二十(20)天內收到　合格申報通知書除外。

7.違約及終止。倘賣方在　本銷售條款及條件下之義務時有重大違約　為，且在收到買方相關書面通知後　十(60)天內未作任何違約糾正，則買方可終止該協議。該終止須為買方在賣方違約情況下的唯一補救措施。

倘買方未能支付本銷售條款及條件下到期款項、在交付前取　消或意圖取消該協議或拒絕交付或未能　其在該銷售條款及條件下的任何義務或未能向賣方支付任何其他協議下到期之款項或其它款項，則須視買方嚴重違反該協議。倘買方嚴重違約，則賣方可經書面通知買方後，(1)暫停　全部或部分義務及撤回全部或部分裝運，(2)終止該協議，(3)宣告拖欠賣方的全部款項即時到期應付，及／或(4)召回在運產品、取回相關產品並收回買方向賣方持有的任何產品，而無需進　任何其他程序，且買方同意，　所有召回、取回或收回的產品均屬賣方財產，惟買方因此獲得信貸。賣方就　任何前述補救措施概　得妨礙任何其他補救措施的執　，且該等補救措施的存在或執　概　解釋為以任何方式限制賣方根據《統一商法典》或其他法　可　使的任何權　或補救措施。

8.專　及其他知　產權。倘產品包括碳化矽或三族氮化物半導體晶片(包括半絕緣晶片和　芯片)，則買方可將所購晶片用於科研　域的研發及生長，但碳化矽及三族氮化物材　塊體生長除外。作為其中一個銷售條件，買方保證其　將任何所購晶片用於碳化矽或三族氮化物材　的塊體生長，或在該等材　塊體生長過程中使用任何所購晶片。就該協議而言，在外延厚　足150微米的單一基片上生長一層或以上的碳化矽或三族氮化物外延層並　視為塊體生長。買方　得在　割前向第三方轉讓晶片，除非買方書面告知第三方相關附件實質上受以下形式限制：「本材　經許可用途有限，且　得用於碳化矽或三族氮化物材　的塊體生長或該等材　塊體生長過程。」

根據本銷售條款及條件銷售產品或提供服務概　表示授出賣方擁有或控制的任何專　、版權、商標或其他專屬權　下之任何明示　或暗示許可，　是否與已售產品或任何生產過程或其他事宜相關。賣方明確保　任何該等專　、版權、商標或其他專屬權　下的全部權　。此外，買方同意，採用本

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree 銷售条款及条件（中文版）**

Page 2
**第 2 页**

銷售條款及條件下出售之產品的組合或系統概　會直接或間接侵犯Cree, Inc.或其附屬公司任何專
　。

賣方可就針對買方提起的任何起訴或法　程序作出抗辯，只要該起訴或法　程序以一項申　為基
礎，即在本銷售條款及條件下提交產品(完全依照賣方設計之規格生產)的設計或生產，侵犯於出貨
日簽發之任何美國專　權，惟買方從速書面通知賣方該起訴或法　程序並就該抗辯給予賣方全面的
授權、資　及協助。在任何起訴或法　程序中，賣方將支付最終判決買方敗訴或以付費達成和解的
該侵權申　所涉全部損害賠償和費用，但　買方未經賣方事先書面同意 (賣方可全權酌情決定　給
予同意)達成任何和解，賣方概　對此負責。　該產品被視為侵犯任何美國專　權且禁止使用或銷
售該產品，或　賣方認為該等產品可能成為侵權申　的　由，賣方可全權酌情決定以自付費方式獲
取一項許可以保護買方避免因中　支付賠款、用非侵權產品取代該等產品，或要求退還該產品並返
還一筆等價於買方就該產品向賣方支付的價款。

前文述明在依據或涉及任何指稱侵犯任何專　權或其他知　產權的任何申　中，賣方的單一法　責
任。凡基於本協議下提供的任何產品與並非本銷售條款及條件下提供之產品、設備或材　，或任何
物品(用本協議下提供之產品製成)的任何侵犯或損害賠償申　，賣方概　負責。

　賣方因遵循買方的設計、規格或指示而引起任何聲稱侵犯專　權、商標或其他知　產權，則買方
須就該聲稱作出抗辯，並保護賣方　受該聲稱造成的任何費用、損失、成本或損害賠償之損害。

9.有限保證。賣方保證，其於本協議下提供的產品將符合並依照賣方於出貨日公佈的該產品規格運
(在規格指定的偏差範圍內)，有效期為自出貨日起九十(90)天的期間；但如為賣方的發光二極管
模型產品，則該期間為自賣方出貨給買方之日起五(5)　零6個月，或自賣方出貨給其

顧客之日起五(5)　，以較早日期為準。在本保證下賣方的法　責任及買方的唯一補償限於修　或
換賣方認定有缺陷之物品，或賣方全權決定退還就該物品支付予賣方的購買價款。賣方在本保證下
無任何法　責任，除非買方發現缺陷後從速書面通知賣方，並預付運費向賣方退還缺陷物品，且賣
方收到該物品的日期　遲於保證期屆滿後十(10)天。本保證　適用因誤用、　當裝設、　當運作、
　用或污染(　內部或外部)造成的任何運　缺陷或故障，且賣方無須對任何設備或其他用該產品
製成的物品的任何形式的故障負責。　產品乃按賣方自行設計並製而成，則　適用本保
證。概未就該等非標準產品作出任何保證(除非賣方另外以書面形式明確議定)。

賣方向買方保證，本銷售條款及條件下所提供之服務將以合　、專業之方式　。賣方在本保證下
無任何法　責任，除非賣方在提供服務後九十(90)天內接獲聲稱違約及相關描述之書面通知。在本
保證下，賣方的全部法　責任及買方的唯一補償限於提供賣方合　認定對糾正該違約屬必要之補償
或替換服務。

**上述保證條文具排他性，並在取代任何及所有其他保證(明示或默示)的基礎上作出及獲接受，包括
但　限於任何　受侵犯的保證，或適銷性或符合特定目的之隱含保證。**

因任何違反保證的買方補償(所有其他補償除外)限於本銷售條款及條件內訂明者，包括但　限於附
帶或相應的損害賠償。買方　得依憑任何保證或協議以　改或擴大上述保證及補償條文的限制，除
非該保證或協議為書面形式並經賣方總裁或副總裁簽署。　得將賣方的陳述或確認(無　文字或
動)解釋為保證。如向買方展示任何模型或樣本，則該模型或樣本僅用於　明產品的一般　型及質
素，並　表示產品必須符合該模型或樣本。

10.法　責任限制及申　。在任何情況下，賣方在損害賠償或其他方面的全部法　責任　超過賣方
在本銷售條款及條件下收取之款額(如有)。在任何情況下，賣方概　就任何形式的附帶、相應或特
殊損失或損害賠償(無　因而產生)，或任何懲罰性、懲戒性或其他損害賠償負責。就任何由本協議

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree 銷售条款及条件（中文版）**

Page 3
第 3 页

或賣方提供之產品或服務引起或在任何方面與此相關的訴訟( 何種形式)而言，買方須在訴訟原因產生後一(1) 內提出訴訟。

**11.完整協議。** 本協議構成各方的完整協議，並取代先前所有協商、建議、協議及 解( 口頭或書面)，而該等協商、建 議、協議及 解涉及本銷售條款及條件項下擬購買之產品或本協議的標的物。凡本銷售條款及條件未明確包含或提述之任何陳述、保證、交 習慣或交 慣， 均 對賣方構成約束。

**12. 師費。** 如欠付購買價款或其中任何部分款項，買方同意支付賣方費用，包括合 的 師費及買方因強制付款而招致的費用(包括所招致的有關任何仲裁或司法程序的所有費用)。

**13.仲裁。** 本協議、協議 或違約引起或與之相關的任何爭議或申 (包括但 限於任何因疏忽、失實陳述、嚴格法 責任或其他依據提出之申 )，且所涉 額超過50,000美元( 包括 息及成本)，則根據國際商會的《調解及仲裁規則》予以仲裁解決(如一方要求仲裁)。如賣方的主要辦事處位於美國，則仲裁地點為 卡 萊納州 市；或如賣方的主要辦事處位於美國境外，則仲裁地點為香港。該仲裁決定應為最終及具約束 的決定，就此仲裁提交之任何裁決可於任何具司法管轄權的法院登 。

**14.轉讓。** 未經賣方事先書面同意，買方 得轉讓或出讓本協議下任何權 或申 ，未獲上述同意而作出的任何意圖轉讓均無效。本協議對各方的繼任人及獲准受讓人具約束 並符合其 益。

**15.出口管制。** 賣方的產品出口及與之相關的任何技術資 ，均受限於美國及／或其他國家或國際(如 合國)法 及規 ，而該法 及規 管制技術 授及產品的出口及再出口，或限制向特定國家或出口 干產品(如禁運規定)。如適用法 禁止或在取得所有必要政府授權之前，賣方無須根據本銷售條款及條件向買方出口、轉讓或交付任何產品或相關技術資 。在本銷售條款及條件，賣方概 就因未能獲取或延遲獲取任何必要政府授權而產生的任何費用或損害賠償負責。買方應完全遵守美國政府所有出口管 及管制法 及規 及／或其他國家或國際(如 合國)法 及規 ( 適用於從賣方購得的任何產品的出口、再出口、轉售或其他處置)。

**16.產品安全。** 買方應完全遵守適用於製造、分銷或銷售物品(用賣方供應之產品製成)的所有 業安全標準，包括但 限於美國國家標準協會(ANSI)／ 美照明工程協會(IESNA)RP-27 (或相當的人眼安全標簽標準)及國際電工委員會頒佈的國際標準 IEC 62471-2006 (包括該標準(如適用)規定的所有標記、標簽及用戶 (如有))。買方應完全遵守任何政府機構的所有適用安全法 、規則及規 ，而該政府機構具有規管製造、分銷或銷售物品(用賣方供應之產品製成)的司法管轄權。買方須負責所有從買方購得該產品的人士及實體(終端用戶除外)遵守上述適用於該等人士或實體的 業標準、法 、規則或規 。買方須就任何聲稱買方未遵守上述 業標準、法 、規則或規 作出抗辯，並保護賣方 受下述損害：與此有關的任何 開支、損失、費用或損害賠償，或買方所製造之產品(採用賣方提供之產品製成)引起的任何人身傷害、疾病或財產損失。

**17.一般條款。** 如從賣方購得的產品被用於 政府合約或分包合約，政府規定或規 均 對賣方具約束 ，除非買方以書面形式明確議定。本協議的修改、修訂、撤銷、放棄或其他 改均 對賣方具約束 ，除非賣方以書面形式議定。本銷售條款及條件任何條文(全部或部分)無效或 可強制執 ，均 影響本銷售條款及條件任何其他條文的有效性或可強制執 性。任何一方未能或延遲 使本銷售條款及條件的任何權 、權 、特權或補償，並 構成上述權 、權 、特權或補償的放棄。本銷售條款及條件所載章節標題僅為方 提述之用， 得用於解釋或詮釋本協議。

Cree Sales Terms Including LED Module Warranty
CPR3T Rev. A
08/22/18
**Cree 銷售條款及條件（中文版）**

Page 4
第 4 頁